```
 1                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF CONNECTICUT
 2
   - - - - - - - - - - - - - - - - x
 3                                    No. 3:18-CR-116 (MPS)
   UNITED STATES OF AMERICA
 4                                    AUGUST 26, 2021
   vs.
 5                                    10:05 A.M.
   JODIAN STEPHENSON
 6                                    SENTENCING
   - - - - - - - - - - - - - - - - x
 7

 8                         450 Main Street
                        Hartford, Connecticut
 9

10        BEFORE:   THE HONORABLE MICHAEL P. SHEA, U.S.D.J.

11

12

13   APPEARANCES:

14   FOR THE PLAINTIFF:

15           UNITED STATES ATTORNEY'S OFFICE
                 157 Church Street, 23rd Floor
16               New Haven, Connecticut 06510
             BY:  HENRY K. KOPEL, AUSA
17
   FOR THE DEFENDANT:
18
             FEDERAL PUBLIC DEFENDER'S OFFICE
19               265 Church Street, Suite 702
                 New Haven, Connecticut 06510
20           BY:  TRACY HAYES, AFD

21

22

23   COURT REPORTER:  Julie L. Monette, RMR, CRR, CRC
                         (860) 212-6937
24
   Proceedings recorded by mechanical stenography, transcript
25   produced by computer.
```

```
 1                        10:05 A.M.

 2          THE COURT:  We're here in the United States versus

 3  Jodian Stephenson.  We're here for sentencing.  The case is

 4  18-CR-116.  Let's begin by having counsel state appearances.

 5          MR. KOPEL:  Thank you.  Good morning, Your Honor.

 6  Henry Kopel for the United States.  Also at counsel table is

 7  Special Agent Jeff Farragher from Homeland Security and

 8  Immigration Officer Cynthia Sponseller from U.S. Citizenship

 9  and Immigration.

10          THE COURT:  Good morning.

11          MR. HAYES:  Good morning, Your Honor.  Tracy Hayes on

12  behalf of Jodian Stephenson.  Ms. Stephenson's present and

13  before Your Honor this morning.

14          When she addresses the Court, Your Honor, she would

15  ask to remain seated.  She gets dizzy when she stands up.

16          THE COURT:  That would be fine.

17          MR. HAYES:  And also with us this morning in the

18  audience is her mother and her uncle.

19          THE COURT:  Good morning everyone.

20          Good morning, Ms. Stephenson.

21          I know Officer Xenia Gray is entering the courtroom

22  now.  She's of the United States Probation Office.  Officer

23  Gray authored the Presentence Report in this case, and she's

24  also present with us today.

25          By way of background, Ms. Stephenson appeared on
```

1  August 19, 2019, before United States Magistrate Judge Sarah

2  Merriam.  At that time she pled guilty to Count One of an

3  Indictment which charges conspiracy to commit immigration or

4  marriage fraud in violation of Title 18 United States Code

5  Section 371.

6          I reviewed the transcript of Ms. Stephenson's guilty

7  plea proceeding; and after doing so, I entered an order

8  accepting her guilty plea on November 7, 2019.

9          The Presentence Report was prepared by Officer Gray on

10 behalf of the Probation Office.  The initial report was filed

11 on April 27th, the final report on May 21st of this year.  I've

12 reviewed these materials.  I've consulted with Officer Gray,

13 and I've reviewed her Sentencing Recommendation.  I've also

14 reviewed the Defendant's Sentencing Memorandum and exhibits,

15 and I've reviewed the Government's Sentencing Memorandum as

16 well.

17         Turning now to the Presentence Report, Attorney Hayes,

18 have you had a chance to review that document and discuss it

19 with Ms. Stephenson?

20         MR. HAYES:  I have, Your Honor.

21         THE COURT:  And, Ms. Stephenson, Officer Gray --

22 excuse me -- Officer Gray, who's sitting with us in the

23 courtroom today, prepared the Presentence Investigation Report

24 based on her investigation of the case, including her interview

25 with you.  Have you had a chance to review her report?

1        THE DEFENDANT:  Yes, sir.

2        THE COURT:  All right.  And have you had a chance to

3   discuss it with your lawyer, Mr. Hayes?

4        THE DEFENDANT:  Yes, sir.

5        THE COURT:  And did you understand what was in the

6   report?

7        THE DEFENDANT:  Yes, sir.

8        THE COURT:  All right.  And at this time, Attorney

9   Hayes, do you have any objections to any of the factual

10  statements in the Presentence Report?

11       THE DEFENDANT:  No, Your Honor.

12       THE COURT:  All right.  Thank you.

13       And does the Government have any objection to any of

14  the factual statements of the Presentence Report?

15       MR. KOPEL:  No, Your Honor.  Thank you.

16       THE COURT:  There being no objections to the factual

17  statements in the Presentence Report, I adopt those as my

18  findings of fact.  I accept the Plea Agreement that was filed

19  on August 19, 2019.  I'm satisfied that the agreement

20  adequately reflects the seriousness of the actual offense

21  behavior and that accepting the agreement will not undermine

22  the purposes of sentencing.

23       Ms. Stephenson, because of the offense you pled guilty

24  to, you face the following maximum penalties:  You face a

25  maximum term of imprisonment of five years.  You face a term of

1    supervised release of a maximum of three years.  Under the law,

2    you are eligible for probation.  If the Court were to impose

3    probation in this case, the maximum term would be five years,

4    and the minimum term would be one year.  You face a maximum

5    fine of $250,000.  I'm also required to impose a special

6    assessment of $100.

7          Does either counsel have any correction to my

8    statement of the maximum penalties?

9          MR. KOPEL:  No, Your Honor.

10         MR. HAYES:  No, sir.

11         THE COURT:  Ms. Stephenson, the next thing I want to

12   talk about is the sentencing guidelines.  The guidelines is a

13   body of advice issued by the United States Sentencing

14   Commission, which is an agency in Washington.  And the

15   guidelines provide me, as the sentencing judge, with guidance

16   on what would be a fair and just sentence in your case.

17         There are separate guidelines for different types of

18   offenses.  This is a conspiracy case.  The conspiracy guideline

19   directs the Court to look to the underlying crime, which is the

20   marriage fraud, and there's a specific guideline for marriage

21   immigration fraud that directs me to consider certain

22   characteristics that this crime might have, for example, the

23   number of false applications.

24         The end result of the process of applying the

25   sentencing guidelines in a particular case -- I'm sorry.  The

1    guidelines also direct the Court to consider the nature and

2    extent of the defendant's criminal record.  I'm well aware you

3    don't have a criminal record.  But the end result of the

4    process of applying the guidelines in a particular case is to

5    point the Court to a range of months of imprisonment that the

6    Sentencing Commission has decided would be appropriate in a

7    case like your case.

8           Now, I'm not required to sentence you within that

9    range, but I have to consider the range.  I also have to

10   consider other factors in deciding on your sentence, and I'll

11   explain those factors later.

12          So the parties seem to have -- the probation officer

13   seems to have concurred with the parties' calculation of the

14   guidelines range.  Just verify that.

15          Right.  And I, too, concur with the parties and the

16   probation officer.

17          In particular, using the manual dated November 1,

18   2018, which is the one in effect today, the base offense level

19   is 11, and that's from Section 2L2.1(a), which is the

20   underlying -- offense underlying the conspiracy.  Six levels

21   are added because the offense involved at least 28 fraudulent

22   marriages.  Another four levels are added under Section

23   3B1.1(a) for Ms. Stephenson's role as the organizer or leader

24   of a criminal activity that involved five or more participants.

25          However, because Ms. Stephenson has clearly

1   demonstrated that she's accepted responsibility for her offense

2   and assisted authorities in the investigation or prosecution of

3   her own misconduct by timely notifying them of her intention to

4   plead guilty, the offense level is decreased by two levels

5   under Section 3E1.1(a).  The Government has also filed a motion

6   for an additional point reduction under 3E1.1(b).  I grant that

7   motion now, and the resulting offense level is 18.

8           As I noted, Ms. Stephenson has no criminal record, and

9   so that places her in Criminal History Category I.  A Criminal

10  History Category I with offense level 18 results in a

11  guidelines range of 27 to 33 months of imprisonment, a term of

12  supervised release of one to three years.  Under the

13  guidelines, Ms. Stephenson is not eligible for probation.  The

14  fine range is 10,000 to $100,000, and there's a special

15  assessment of $100.

16          Is there any objection to the Court's calculation of

17  the guidelines range?

18          MR. KOPEL:  No, Your Honor.

19          MR. HAYES:  No, sir.

20          THE COURT:  Okay.  All right.  Ms. Stephenson, we've

21  now reached the heart of this proceeding, and now what I'm

22  going to do is I'm going to ask Mr. Hayes to speak on your

23  behalf.  If he would like to present any speakers, he can.  I'd

24  also be happy to hear from you.  You don't have to speak, but

25  I'd be happy to listen to anything you might want to say.

1          When your side of the courtroom is done presenting,

2     I'm going to ask Mr. Kopel to speak.  After that, I'm going to

3     take a short recess to reflect on everything that's been said

4     and collect my thoughts.  After that, I will return to impose

5     sentence.

6          So Mr. Hayes.

7          MR. HAYES:  Thank you, Your Honor.  I met

8     Ms. Stephenson two years ago, and at the time I knew she was

9     dealing with depression.  We talked about it, and I knew she

10    was seeing a specialist.  Her probation officer also connected

11    her with a therapist.  So I knew that she was dealing with

12    that.

13         Despite dealing with depression, she's very vibrant,

14    energetic.  And the Jodian Stephenson that I know, at least

15    that I knew then when I met her, she just had a child, an

16    infant, a baby.  She was in college, working her way through

17    college, paying for it on her own.  And she worked at least

18    three jobs.

19         Within a year she had another child, and she continued

20    to work.  She continued to pay her way through school, pay her

21    way through college.  That was something that we talked about

22    every time we talked to one another, because I knew how

23    important it was for Mrs. Stephenson to get through college, to

24    graduate, to not only just better her life but better the lives

25    of her family, her children.

1          Two years later she now has another child, another

2     baby who's about seven months old now; so she has three

3     daughters.  The oldest one is three years old.  So they're all

4     under the age of four, and that's significant because now's the

5     time that they need their mother.  You always need your parents

6     but definitely when during those early years, um, when the

7     development is critical.

8          So that person that I knew, even leading up to the

9     presentence interview, I have to say, she was still working.

10     She was in between semesters.  She was raising the children.

11     And, um, she'd come by the office whenever we needed to meet.

12          Then, um, things started to take a turn regarding her

13     health and her mental health issues, and they seemed to be more

14     pronounced.  And so I don't want to say she's different, but

15     what I see from Ms. Stephenson today is different than when I

16     first met her.  And this is how:  She's unable to work because

17     of her medical and mental health issues.  And I've listed them

18     in my sentencing papers, but I think it's important to talk

19     about some of these.

20          So what we see is she's dealing with depression.

21     She's on a schedule to take medication.  So she takes her first

22     pills, if you will, at usually around 8:00 a.m.  And this is

23     after she's cared for the children.  They're now perhaps in day

24     care and she's taken care of that.

25          Because of the type pills that she takes, she then

1    goes to sleep for a couple of hours.  So she was concerned

2    about taking the pills this morning.  I remember when we

3    scheduled this for 10:00 a.m.; so we discussed at length, you

4    know, what we should do.  And she agreed to just take them

5    before the proceeding.  So before the Court took the bench this

6    morning, she'd just taken her pills.  So you're seeing some of

7    the effect of that from Ms. Stephenson so in terms of when I

8    asked the Court to allow her to sit when she addresses the

9    Court because of the dizziness and that type of effect.

10          So she also has seizure disorders.  And, um, it occurs

11   at various times, typically when she's overwhelmed; and that's

12   explained by her doctor in my sentencing papers.  She gets

13   overwhelmed.

14          So as recent as last night, when I talked to

15   Ms. Stephenson, you know, I asked her, I go -- "I understand,

16   um, postpartum depression," or to the extent that I can

17   understand it, "but is that -- would you say that's what we're

18   seeing or is it everything?"  And so I would think it's

19   everything, meaning as we get closer to today, she's just

20   overwhelmed.

21          She's explained that when she starts to think about

22   the case, about her family, she has anxiety attacks.  So she

23   has anxiety disorder.  She also has medical issues that we've

24   listed.

25          All of that has caused her to stop working.  And,

1    again, this is someone who, since I've known her, has held

2    three jobs.  In fact, I would often chastise her to slow down

3    because it was a lot.  You could see it was a lot, raising the

4    family, going to school, um, and holding down three jobs.

5         And so she's not working anymore.  At least she's not

6    working -- she hasn't been working for the past easily three

7    months.  She needs a home care provider to help her with the

8    children, with the three children.  She's not in school.  She's

9    home most of the time.

10        So those meetings at my office, we can't have them

11   anymore because she can't drive until after -- we have to go

12   out to her to meet with Mrs. Stephenson.  So even as late as

13   close to 9:00 p.m. last night, we were meeting to discuss

14   today, to discuss the case.  So her life has changed.

15        At heart I know she's still the same person, a person

16   who cares about other people, a person who wants to do better

17   for herself and for her family.  But hopefully she'll come out

18   of what we're seeing.

19        I am concerned about Mrs. Stephenson if she is

20   incarcerated, what will happen, what will occur.  So I'd ask --

21   obviously I would ask the Court to think about that.

22        When I talk about her three children and their ages, I

23   talk about that because I think this is unique in terms of what

24   we see with a defendant, a female defendant before Your Honor,

25   before the federal court, was three children under the age of

```
1    four who she's raising.  And she is the -- basically the sole
2    care provider for her children.  There's no one else who could
3    raise her children.
4              THE COURT:  Can I ask about that?
5              MR. HAYES:  Sure.
6              THE COURT:  My understanding was she was living with
7    Shanon Stephenson.
8              MR. HAYES:  She is, Your Honor.  He is, um, because of
9    the amount of work it takes to take care of the children,
10   doesn't sleep as he should.  He drives a truck over the road.
11   And so part of the reason why they need -- why Ms. Stephenson
12   needs the health care provider is so that he can get sleep
13   because it affects him when he's driving.
14             THE COURT:  It's a health care provider or it's a
15   nanny or --
16             MR. HAYES:  No.  It's a home care provider.
17             THE COURT:  Home care provider.  So this person helps
18   with the children, helps with housework, that kind of thing.
19             MR. HAYES:  Yes, although they have not started yet.
20   So we're still waiting for that person to start, just to allow
21   him to get sleep.  So I believe the Court may be familiar with
22   someone who's driving a truck, sleep is important.  You have to
23   log your sleep hours, log your driving hours.  And so he's not
24   getting the sleep that he needs.  So, yes, he's there, but he's
25   on the road often.
```

1          So I don't want to say everything falls on
2   Mrs. Stephenson, because he does his part, but the bulk of that
3   work is Mrs. Stephenson's.  So she's on a schedule because
4   obviously the children are on a schedule.  So she wakes up
5   around one o'clock, then prepares their dinner when they come
6   back home -- well, she cannot drive the car to drop them off or
7   pick them up.
8          THE COURT:  Drop them off at day care?
9          MR. HAYES:  Yes.
10          THE COURT:  Okay.
11          MR. HAYES:  So --
12          THE COURT:  Who does that?
13          MR. HAYES:  The children's grandparents, their
14   paternal grandparents.
15          THE COURT:  They live nearby?
16          MR. HAYES:  They do, Your Honor.  But I know that
17   she's moving at least two cities over, and -- right.  I
18   neglected to ask her last night what will happen because I
19   didn't want to -- it was so precarious seeing her at a hotel
20   with the family.  It -- but they're not going to be able to do
21   that when she moves.
22          So -- and I recall asking Mrs. Stephenson, at least
23   six months ago, "So, you know, I know that you are still having
24   concerns about your neighborhood.  When are you going to move?"
25   She said, "Look, the children are in good schools, and so I'm

1    reluctant to move."  But she had to ultimately.  So, no, they
2    won't be able to do that.
3         When -- to pick up the children, you need at least two
4    people in the vehicle.  So when she wakes up, she picks up the
5    children.  One has to stay in because you're picking them up
6    from different facilities.  So she won't have that.  The
7    children won't have that.
8         THE COURT:  They range in age from about what, eight
9    months to four years?
10        MR. HAYES:  So the oldest one is three years old.  And
11   then the middle-aged one is two years old.  The youngest one is
12   seven months.
13        The two-year-old and the seven-year-old (sic) have
14   health issues, respiratory issues, problems breathing.  The
15   middle daughter has been hospitalized because of that.  The
16   youngest one is still sort of going through that now.  The
17   middle one has to have surgery on her lip area soon.  There's
18   problems when she speaks.
19        THE COURT:  It would have been helpful to have papers
20   about that, but --
21        MR. HAYES:  I just -- so, Your Honor, I have to
22   mention to the Court that, um, it was easier when we could meet
23   with Mrs. Stephenson when she came to the office.  But once I
24   realized that she really could not travel, it took some time
25   for me to realize that.  And once I realized that, I started to

1    have to go out to her.

2            So we -- some of these things I'm learning now.  So we

3    would either talk on the phone or we'd have to go to her house

4    and either get a release or get some of these documents or

5    contact her doctors.  So some of this I'm learning now; some of

6    this I'm learning more recently.  It's not as if we haven't

7    made efforts.  That's what I could inform the Court.  We've

8    made efforts all the time.

9            I think things changed when she became ill.  Just

10   meeting with her, knowing that we're in the middle of her

11   schedule, not realizing that she really needs to rest.  We were

12   meeting with her in the afternoon and trying to get documents

13   done, trying to go over the PSR, those types of things.  So it

14   presented some difficulties.

15           But I say that to inform the Court that these present

16   circumstances, extraordinary circumstances, in terms of

17   Mrs. Stephenson raising her children, being in her children's

18   lives, continuing to do so and without her there, without

19   someone being able to take care of them.  And even if there

20   were someone to take care of them, not having their mother

21   raise you presents -- I would say has a devastating effect,

22   right, on all of them, not even just the infant who's growing,

23   used to her mother, but all three of them.  And I'd ask the

24   Court to consider that.

25           In saying that, Your Honor, there -- what we presented

1  to the Court was a consideration of a departure under 5H1.1
2  (sic) I believe it's 6.
3        THE COURT:   Family circumstances.
4        MR. HAYES:   That's correct.  And with that type of
5  departure, honestly, Your Honor, this is -- because I believe
6  this is so rare that we see this, where we have -- that I see
7  this I should say -- that you have a mother with children who
8  are not teenagers, not adolescents, but still in the young
9  ages, so I have not dealt with this departure extensively
10  before.
11        I do know that the Second Circuit has held that once
12  the Court concludes that there are exceptional family
13  circumstances, the guidelines direct the Court to grant a
14  departure that would effectively address the loss of care
15  taking or financial support.
16        I don't know if, when this case is behind
17  Mrs. Stephenson, will she get back to where she was.  We talked
18  about that.  I asked her that.  She doesn't know.  We believe
19  so.  We hope so, to get back to working, to get back to going
20  to school and finishing her degree.
21        One thing that stood out, Ms. Stephenson talked about
22  having to accept social services and being embarrassed because
23  this is the first time in her life, and she's always taken
24  pride on working, working for herself.
25        When she first started college, she realized that she

1    could not get any money, any financial aid, if you will,

2    because of her immigrant status; so she had to work.  That

3    takes us to this case.

4            I do -- and you'll hear from Mrs. Stephenson.  She

5    expresses remorse.  She's expressed that to me.  She's

6    expressed that all the time.

7            And I asked her, "Well, is it because you got caught?"

8    She said, "No, it's more than that.  I didn't realize the

9    seriousness."  I probably should have -- the Court should have

10   heard that from Mrs. Stephenson.

11           So I talk about that because she realized, well, I

12   could make money but really I could help people.  I think at

13   first that's how it started, wanting to help people, not

14   realizing I can make money, put myself through school.  Then

15   she realized I could make money and put myself through school,

16   still not realizing the seriousness of what she was doing, how

17   serious of a crime that was, what it did to others; that it was

18   a crime against the country, frankly; that she was not just

19   flouting the law but violating federal law.  I don't think she

20   grasped that at the time as she does now.  So I do want to make

21   that representation.

22           Your Honor, the Court indicated earlier that she has

23   no criminal history.  So this is someone who's 37 years old.

24   She's lived here in the United States for some time since she

25   was around her early twenties and lived in Connecticut, lived

1  in New York City, no criminal history whatsoever.

2          Since her arrest in this case, since she first

3  appeared in court, she's not violated the law.  She's stayed

4  within not just the bounds of the law that got her in the law

5  but just abided by the conditions set by the Court.

6          At some point she was released and she wore a GPS

7  device for several months, and then she earned the trust of the

8  Court to allow that device to be removed.  She completed

9  therapy.  At the time she was in therapy.  I say completed it.

10  She never needed drug or substance abuse therapy.  It was

11  mental health therapy.  So even though she completed it, she

12  had to go back because she needed more.  She now continues with

13  that therapy.

14          THE COURT:  I did note there was some of -- with

15  regard to the therapy, some of the records you suggest suggest

16  that she had not been attending regularly.

17          MR. HAYES:  So she -- there was a month that she did

18  not attend.  That's the month that she had given birth, so she

19  missed a couple of sessions.

20          THE DEFENDANT:  Over the phone.

21          MR. HAYES:  So she has been doing it telephonically.

22          THE COURT:  Well, perhaps you just attached the same

23  page multiple times then, because several of these pages

24  actually say, "Client has not been in treatment for the month

25  of January.  It is encouraged to engage in treatment to work on

1    developing new behaviors that encourage a law-abiding life

2    style."  And then, "Client was working on this goal and making

3    progress in December 2012."  I think they mean December 2020.

4              MR. HAYES:  They do.

5              THE COURT:  "However, has not been in attendance this

6    past month."  But that's dated February 4th.  So that page

7    apparently is repeated several times.

8              You're saying she is going to treatment now?

9              MR. HAYES:  She is.  And, Your Honor, I'm sorry.  When

10   I saw that, that's a log; and so it repeats that same thing.

11   But it's also saying, yes, she's attending.  But currently that

12   month of January is when she gave birth to her youngest

13   daughter.  So she was giving birth, and she didn't attend those

14   sessions around that time.

15             THE COURT:  Right.  I guess the only point I'm making

16   is that I don't really have much by way of records that show,

17   in fact, she was attending.  What I have mostly is records that

18   show that she wasn't attending.  But that may be because I got

19   a record for January 2021 multiple times.  But I'm just telling

20   you I don't really have that much -- well, there's one from

21   April.  So some show she's attending, and some show she's not.

22   But it would have been helpful -- I don't think I have anything

23   after April, April 4th.

24             MR. HAYES:  Your Honor, she went as recent as last

25   week.  I can inform the Court that these were the documents

1    that we were given --

2              THE COURT:  Okay.

3              MR. HAYES:  -- by the provider.  So the last page of

4    what would be Attachment A indicates that the document was

5    signed May of 2021.

6              THE COURT:  Yeah.  Is there an actual record from May?

7    Doesn't really look like it.  Yeah, okay.  Anyway, I hear you.

8              MR. HAYES:  But she's actively attending.  I know

9    because we've -- I talked to her probation officer, and I

10   talked to Mrs. Stephenson.  If she was not in compliance, we

11   would have known that.

12             THE COURT:  Okay.

13             MR. HAYES:  But I also just know that Ms. Stephenson

14   needs that therapy, and it's important to her.

15             THE COURT:  How often does she go?

16             THE DEFENDANT:  I have therapy at least once a week,

17   but I have a private provider through my insurance as well that

18   I talked to.  We do telehealth.

19             MR. HAYES:  So there are actually two, Your Honor.

20   There's one that she attends as part of the court once a week.

21   She also has a private provider from her insurance that she

22   also attends.

23             THE COURT:  Okay.

24             MR. HAYES:  But they're telehealth.

25             THE COURT:  I see.  One other question, Mr. Hayes,

1     before I forget.

2              MR. HAYES:  Yes, sir.

3              THE COURT:  What have you been able to find out, if

4     anything, about the likelihood -- and I will certainly ask the

5     Government this as well -- the likelihood that Ms. Stephenson

6     will be deported as a result of the conviction?

7              MR. HAYES:  So the Government's probably better to

8     answer that.  From what I know now, I know she's working on her

9     status, on gaining status here currently.  That's the only

10    thing I could inform the Court of it now.  So I don't know

11    anything about --

12             THE COURT:  Okay.  Thank you.

13             MR. HAYES:  So, Your Honor, all of that, I'm asking

14    the Court to consider that there are extraordinary

15    circumstances here that we don't often see in fraud cases and,

16    in general, that they're presented here to the extent that the

17    Court has to consider either a variance or downward departure

18    that would allow Mrs. Stephenson to receive a type of

19    punishment where she's not incarcerated and away from her

20    children, where she can continue to provide for the children,

21    continue to raise the children.

22             I would say to the Court that for the past two years,

23    Mrs. Stephenson has been incarcerated, whether it was the GPS,

24    where even though she had some where she could move, she was

25    still on curfew.  And then even after that, she still had to

1    abide by conditions of the Court.

2          Now, perhaps it wasn't asking a lot of someone who

3    wasn't -- who doesn't have a criminal history; but it was still

4    weighing on her over time to what we see today, which is why I

5    started with her physical ailments as well as her mental health

6    issues in terms of what I didn't mention was something called

7    conversion disorder, which I guess is what causes the seizures.

8    That's a neurological disorder, which is why she has to take

9    the medication.  There are extensive medications that she takes

10   to help with her medical issues as well as her mental health

11   issues.  And I would ask the Court to consider all of that.

12          In saying that, I know that Ms. Stephenson wants to

13   address the Court.

14          THE COURT:  Okay.  Ms. Stephenson?

15          THE DEFENDANT:  Good morning, Your Honor.

16          THE COURT:  Sorry, Ms. Stephenson, but I do need to

17   ask you to put your mask on.  I can hear you.  I know it's a

18   pain to talk with the mask.  Believe me, I know.  But just pull

19   that microphone close.  I'll be able to hear everything you can

20   say.

21          THE DEFENDANT:  Okay.  First I must say, um, I'm

22   remorsely sorry for the situation I've put myself in.  I didn't

23   know the extent or really of how dangerous this is, and I'm

24   truly sorry about everything.  And I do take full

25   responsibility of my actions.

1          I have not been myself lately due to circumstances of,

2     um, of what I'm going through.  I don't have -- I don't have

3     any control over my illness, and I still can't -- there's

4     almost like there's no cure for it because every time I go to

5     the doctor, they run all these tests, they say I'm okay.  But

6     neurologically I have a chemical imbalance that defeats the

7     purpose for me to work and be capable enough to do my motherly

8     role for taking care of my kids.  That's my most concern is

9     just to be there for my children.

10          And if I could turn back the hands of time, I wouldn't

11    be here, because I'm very sorry.  And I hope that I can also be

12    forgiven for my actions.  And that's it.

13          THE COURT:  All right.  Well, thank you.  Thank you.

14          MR. HAYES:  Your Honor, I just want to -- we talked

15    about, um, why Ms. Stephenson started this.  And I know that

16    it's indicated in the PSR, she thought she was helping people.

17    I think it would be important for Ms. Stephenson to tell the

18    Court what her major was in college, what she wants -- what she

19    wanted to do with her degree.  And she had mentioned a story to

20    me last night about someone she had seen in her neighborhood.

21    I'd ask you to --

22          THE COURT:  Take your time, ma'am.

23          THE DEFENDANT:  Well, previously my major in college

24    was criminal justice because I really wanted to become a

25    lawyer, um, a criminal lawyer, immigration lawyer.  That's what

1  I started out in college.  But after my arrest, I think that

2  dream was -- became diminished.

3       I had another major that I was always interested in,

4  to become a social worker.  So I started to do mental health

5  science in which I know that that would become a very important

6  aspect for me if I do that.  Just the fact that I'm going

7  through it, I would be able to help someone out.

8       And as I was saying to Mr. Hayes last night, I said,

9  even though I'm going through my struggles, I still do care

10  about people's well-being, and I do still have that urge to

11  want to help because that's just the person who I am.  I've

12  been through a lot in my life.  I was raised by my mother as a

13  single mother.  My life was never a bed of rose.

14       I had to start working at age of 17, in which I excel

15  in high school.  I passed eight subjects in which I wanted to

16  start being a teacher.  I was brought here on temporary visa,

17  and when my father realized that he would have to send me to

18  college in Jamaica, he said I should stay here and he would

19  sponsor me.

20       During that process, he tried to sponsor me.  Whenever

21  the documents would come to his house, his wife would destroy

22  them because she thinks maybe if I get through, hopefully I

23  would take my mother here, which she's very jealous of, which

24  that was no intention of my mother.  My mother moved on with

25  her life, and that was never the case.

1          She then started to abuse me.  Then I came.  I didn't

2     have a choice.  My uncle, who's sitting in court today, was

3     offering me a reason why I came to Connecticut, because I

4     didn't have anywhere to go.  He took me in as a daughter.

5          THE COURT:  Sorry.  I'm really sorry to interrupt you

6     at this point, but you have to put your mask on.

7          THE DEFENDANT:  It's just my nose is running.  I'm

8     sorry.

9          THE COURT:  Take your time.  Blow your nose.  You're

10    not in a rush here.  But when you calm yourself, do put a mask

11    on.  The only reason I'm insisting is just for everyone's

12    health and safety.

13         Just take your time.  I'm going to listen to

14    everything you have to say.  There's no problem.  You're not on

15    a clock here.

16         THE DEFENDANT:  Okay.  So after I came to Connecticut,

17    Connecticut, he took me under his wings as his child, and up to

18    this day he has been playing a father, fatherly role in my

19    life.

20         I do still struggle with past traumas of things that

21    happened to me and not only just postpartum depression but my

22    life on a whole, on things that I have been through.

23         THE COURT:  And I'm aware of those things, ma'am.  You

24    don't have to talk about them if you don't want to.

25         THE DEFENDANT:  Yes, I don't want to.  But this is not

1    where I want to be in my life.  I want to be better.  And if I

2    get that chance, I'm sure I will excel in it.  Thank you.

3              THE COURT:  Okay, thank you.  Thank you, ma'am.

4              Mr. Hayes, anything else?

5              MR. HAYES:  No, sir.

6              THE COURT:  Okay.  Mr. Kopel.

7              MR. KOPEL:  Thank you, Your Honor.  You know, I think

8    this is a particularly difficult sentencing decision because

9    there are some very compelling factors, very strong factors on

10   both sides of the balance that has to be ultimately decided.

11             You know, as the Government noted in its Sentencing

12   Memo, there is the most important factor for the Government on

13   one side of the ledger is the need for deterrence, to

14   discourage others who may think of doing these kind of things,

15   which are so negating of the immigration system, already a

16   system which has a lot of difficulties, and these things just

17   compound them.

18             And in terms of that, you know, I would just note that

19   the scheme at hand was a very extensive one.  As the parties

20   agree, even the Government have investigated, there were 28

21   proven false marriages under Ms. Stephenson's guidance seeking

22   or obtaining Green Cards.  It was a very effective business.

23             People are coming from New York, Massachusetts.  Each

24   one was paying -- paid Ms. Stephenson between 17,000 and

25   $20,000.  So it had a lot of remuneration.  As I said, it's

1    very problematic, part of the gaps and problems in our
2    immigration system.
3          And, again, unfortunately, because Ms. Stephenson
4    really was the CEO, really was the organizer/leader of this
5    business, the highest responsibility does lie with her for
6    that.
7          The Government is mindful that there are
8    countervailing considerations.  You know, Ms. Stephenson is a
9    first offender.  She's never before had, as far as we know,
10   contact with the criminal justice system other than this case.
11   We're mindful that her circumstances of coming to the United
12   States and her efforts to be able to stay here were -- she
13   really lacked family support.  She really was on her own, and
14   that placed her in a position of making choices that some other
15   folks might have felt less constrained to make.  So we get
16   that.
17         And we don't -- we think it is a relevant factor that
18   she's the primary caretaker for three young children.  I think
19   it would be foolish to try to minimize that.  And she has
20   substantial health issues.
21         So, unfortunately, I feel that I'm not giving the
22   Court the kind of guidance I wish I could give as Government
23   counsel to say this is what should happen.  I will defer to the
24   Court to take in all these factors and to impose a sentence
25   that is fair and that is just and that accomplishes the

1   purposes of the sentencing law, 3553 of Title 18.  So we would
2   like to see a sentence that does accomplish the goal of
3   discouraging others from doing this while being mindful of the
4   many factors in play in this complex case.
5        I think the Court had a question, which I'll answer as
6   best I can.
7        THE COURT:  Yes.
8        MR. KOPEL:  And what I understand is Ms. Stephenson is
9   in -- removal proceedings have been commenced; and I believe,
10  from what I've been given to understand, the basis of the
11  proceedings is not this criminal case.  It's the simple fact
12  that there's no lawful, factually lawful basis for
13  Ms. Stephenson to be in the U.S.  Ultimately, this will be
14  decided by an immigration judge, and I can't make the call of
15  what the judge will do.  But removal proceedings are underway.
16  The legal basis for removal is believed to be a solid one, and
17  that's where it stands, Your Honor.
18       THE COURT:  All right.  Thank you.
19       As I said, I'm going to take a short recess now,
20  probably about ten minutes, and then I will be back to impose
21  sentence.  We'll be in recess.
22    (Recess from 10:49 a.m. to 11:04 a.m.)
23       THE COURT:  So, Ms. Stephenson, the law requires me to
24  consider several factors in deciding on the sentence.  The
25  factors are listed in Section 3553(a) of Title 18 of the U.S.

1    Code, and they are the following things:  first, your

2    background and characteristics; next, the nature and

3    circumstances of the crime.  I also -- another factor is the

4    purposes of a criminal sentence.

5            And the purposes of a criminal sentence are:

6            Punishment.  And punishment includes the need for the

7    sentence to promote respect for the law and the need for the

8    sentence to reflect the seriousness of the offense.

9            Deterrence is another purpose of a criminal sentence.

10   Deterrence means providing what's called general deterrence,

11   which Mr. Kopel referred to, and that means sending a message

12   to the community that would discourage them from committing

13   this type of crime, in other words, sending a message to

14   others.  Also, specific deterrence, which means discouraging

15   you from committing this or other crimes in the future.

16           Protecting the public is another purpose of a criminal

17   sentence, protecting the public from further crimes by you.

18           Rehabilitation, which means addressing needs that you

19   have that can be addressed through the criminal justice system,

20   mental health needs, for example.

21           Those are the purposes of a criminal sentence that the

22   sentence needs to serve.

23           Another factor the law requires me to consider is the

24   sentencing guidelines.  As I said before, the guidelines here

25   are recommending an imprisonment range of 27 to 33 months and a

1    term of supervised release of one to three years.

2            Another factor I have to consider is the need to avoid

3    unwarranted sentence disparities among defendants with similar

4    records who have been found guilty of similar conduct.

5            What these factors require me to do is to take all the

6    information I've learned about you and about the crime, all the

7    information that was provided in the papers that I referred to,

8    the Presentence Report, the briefs, everything that was said

9    today by Mr. Hayes, by you, by Mr. Kopel, take all that

10   information and view it through the lens of these factors to

11   determine a sentence that is fair, just, and reasonable and

12   also a sentence that is sufficient but not greater than

13   necessary to serve the purposes of sentencing.

14           Now, I've considered each one of these factors, but

15   the best way for me to explain my sentence is for me to walk

16   through them and tell you how I think they apply in this case,

17   beginning with your background and characteristics.

18           The Presentence Report makes clear that, as you put it

19   today, your background does not reflect a bed of roses.  And

20   although I think your childhood was okay in Jamaica and you

21   graduated high school and you came here with dreams, as you

22   said, when you came here, things did not go well, and you

23   suffered a trauma.  There was -- you were not welcomed by your

24   father's partner, and things kind of went south.  You entered

25   into a sham marriage; and, of course, you committed the crime

1     in this case.

2            You have no criminal record.  You've never served

3     time.  As Mr. Hayes has detailed, you suffer from some health

4     and mental health issues.  You don't have legal status, and

5     you -- I'd have to say based on what Mr. Kopel said, I think

6     it's likely that you'll be deported.  That has nothing to do

7     really with me.  That's a separate agency of the Government

8     over which I have no control, but given what Mr. Kopel's

9     advised me, I have to take into account the fact that you're

10    likely to be deported and I should say may be detained before

11    you're deported by ICE.

12           Mr. Hayes has pointed out that you are the mother of

13    three small children who you are the primary caretaker.  I also

14    will point out that I'm aware that I believe your husband is

15    before me in a related case and, in fact, is coming before me

16    tomorrow in that case.  So those are -- that's your background

17    and characteristics that I need to consider today.

18           Turning to the nature and circumstances of the

19    offense, it's a serious offense.  It involves long-standing

20    conduct.  It involves a substantial financial gain by you, over

21    half a million dollars.

22           And -- now, I think it's worth just taking a step

23    back, as Mr. Kopel suggested, this area of the law receives a

24    lot of attention in politics and the like, the immigration laws

25    and the like.  The first thing I would say is I'm a judge and I

1     took an oath to uphold the laws whether I agree with them or
2     not.  And, of course, that's what I'm going to do.
3              I would also say, though, just in commenting on the
4     seriousness of the offense, I think, obviously things like your
5     role in the offense and the amount you profited make this
6     offense -- and how long standing the conduct was -- make this
7     offense more serious.  But in thinking about the harm and the
8     purpose of these laws, I think it's difficult for some of us,
9     including me, having grown up in the state of Connecticut,
10    sometimes to understand the harm of illegal immigration, people
11    obtaining visas fraudulently, because I don't live in a border
12    state.  I've never lived in a border state.  And so I don't
13    really see as much impact from it as others.
14             And the truth is we need immigration in this country.
15    We need it in Connecticut where we're losing population.  So
16    sometimes I don't perhaps fully appreciate the seriousness and
17    all the sort of immediate need for immigration laws.
18             But one effect I am well aware of, which is that
19    because of your behavior, your crime and crimes like it,
20    Homeland Security, USCIS have to expend resources on
21    scrutinizing other people, the applications of truly lawful
22    permanent residents.
23             I know firsthand.  My wife is not from this country,
24    and actually when I was a law student had to -- dealt with
25    applying for a Green Card for her.  It was an incredibly

| | |
|---|---|
| 1 | cumbersome process, and this was 30 years ago.  So I can only |
| 2 | imagine it's gotten worse.  And in part it's gotten worse |
| 3 | because of the need for Homeland Security and the like, USCIS |
| 4 | to check for fraud and to make you jump through a lot of hoops |
| 5 | to make sure there's not fraud.  And that is a harm that |
| 6 | I've -- I'm personally aware of. |
| 7 | So it's a long way of saying although some people |
| 8 | might not regard this as the most serious of offenses, it's |
| 9 | certainly not as serious in my mind as a violent offense or |
| 10 | even a drug offense, it's still serious and inflicts harm. |
| 11 | That said, part of the nature and circumstances of |
| 12 | this crime are what happened after you got arrested.  You've |
| 13 | shown strong pretrial adjustment.  You've complied with all |
| 14 | your conditions.  And so that's something the Court's going to |
| 15 | take into account today as well. |
| 16 | In terms of the purposes of a criminal sentence that |
| 17 | need to be served here, I do agree with the Government that the |
| 18 | need to reflect the seriousness of the offense and the need for |
| 19 | general deterrence are purposes that need to be served by this |
| 20 | sentence.  I don't believe that the need to protect the public |
| 21 | or the need to specifically deter you are needs that are |
| 22 | salient here.  And that's because you don't have a criminal |
| 23 | record, and I think your risk of recidivism is low. |
| 24 | So turning next to the guidelines, I think certainly |
| 25 | in light of your strong pretrial adjustment, a guideline |

1   sentence would not be -- would be greater than what's

2   necessary, and certainly I'm going to depart downward in light

3   of your pretrial adjustment.

4         I also agree with Mr. Hayes in part that your family

5   circumstances warrant further consideration, and you're going

6   to receive that consideration today.  I certainly take -- it's

7   certainly difficult for the Court to think about taking a

8   mother away from her children, small children.

9         That said, I don't think that I would be doing my job

10  today in upholding the immigration laws if I didn't impose some

11  prison time.  I just -- the offense is too serious.  Your role

12  was too serious, the extent of the conduct, the fact that you

13  profited from it.  And if someone like you doesn't receive a

14  prison sentence in the sense of if someone who commits this

15  kind of a crime doesn't receive a prison sentence, then really

16  it's very difficult to say candidly that these laws have much

17  teeth.

18        So I don't -- I don't think I can get all the way to

19  the sentence that Mr. Hayes is recommending, although certainly

20  your comments today and his and in general human sympathy would

21  otherwise, I think, push me there.

22        So this is a difficult sentencing.  I know that this

23  has been hanging over you for a long time, Ms. Stephenson.  I

24  know that certainly hasn't helped with your mental health

25  situation.  And I've done my best to take account of all the

1    circumstances and to come up with a sentence that I think is
2    the minimum, the absolute minimum necessary to reflect the
3    purposes of sentencing.  I think the following sentence is
4    sufficient but not greater than necessary to serve those
5    purposes.

6           So for all the reasons I've explained, Ms. Stephenson,
7    I sentence you as follows:  I'm not going to ask you to stand,
8    but I will ask you to look at me, ma'am, because I know Mr.
9    Hayes said you had difficulty standing and I respect that.

10          So I sentence you to six months in prison.  I sentence
11   you to two years of supervised release.

12          In addition to the standard conditions of supervised
13   release, the following mandatory conditions are imposed:
14   first, the Defendant shall not commit another federal, state,
15   or local offense; second, she shall not unlawfully possess a
16   controlled substance; third, she shall refrain from any
17   unlawful use of a controlled substance and submit to one drug
18   test within 15 days of release on supervised release and at
19   least two periodic drug tests thereafter for use of a
20   controlled substance.

21          Actually, I can waive it.  Yeah, so I'm going to waive
22   that condition.  That's not going to apply.  There's no
23   substance abuse history here.  You're not allowed to possess a
24   controlled substance, but you don't have to go through the drug
25   testing.

1          You shall cooperate in the collection of a DNA sample.

2          In addition to those standard and mandatory conditions

3    of supervised release, the following special conditions are

4    imposed:

5          If you are ordered deported from the United States,

6    you must remain outside the United States unless legally

7    authorized to reenter.  If you enter the United States, you

8    must report to the nearest probation office within 72 hours

9    after your return.

10          I don't know, Ms. Stephenson, for sure whether you're

11    going to be deported, and I also don't know if you're going to

12    be deported right after you serve your sentence.  I just have

13    no idea how that process will go, so I'm also going to add a

14    condition aimed at continuing your counseling.

15          You must participate in a program recommended by the

16    Probation Office and approved by the Court for mental health

17    treatment.  You must follow the rules and regulations of that

18    program.  The probation officer, in consultation with the

19    treatment provider, will supervise your participation in the

20    program.  You must pay all or a portion of the costs associated

21    with treatment based on your ability to pay, as recommended by

22    Probation and approved by the Court.

23          I impose no fine.

24          You're required to pay a special assessment of $100.

25          Does either counsel know of any reason that the

1    sentence I've described cannot legally be imposed as the
2    sentence of the Court?
3            MR. HAYES:  No, Your Honor.
4            MR. KOPEL:  No, Your Honor.
5            THE COURT:  Ms. Stephenson, the sentence I've
6    described is imposed as the sentence in your case.  The
7    judgment will be prepared for my signature by the Clerk's
8    Office in consultation with the Probation Office.
9            Ms. Stephenson, you have a right to appeal the
10   sentence.  I don't believe -- I didn't see an appeal waiver in
11   the Plea Agreement.  So if you wish to appeal, you must file a
12   written notice of appeal within 14 days of the entry of
13   judgment.
14           Do you understand that time limit?
15           THE DEFENDANT:  Yes, sir.  Yes, sir.
16           THE COURT:  Okay.  If you wish to appeal but you
17   cannot afford to do so, you can apply for leave to appeal in
18   forma pauperis.  If the Court grants that motion, it will waive
19   the filing fee for your appeal and appoint counsel to represent
20   you at no charge to you.
21           Do you understand that?
22           THE DEFENDANT:  Yes.
23           THE COURT:  Okay.  I believe there's some remaining
24   counts in the Indictment.  Does the Government have a motion?
25           MR. KOPEL:  Yes, Your Honor.  The Government

```
 1   respectfully moves to dismiss Counts Two through Fourteen of
 2   the Indictment.
 3           THE COURT:  All right.  That motion's granted.
 4           Mr. Hayes, is there a request regarding designation?
 5           MR. HAYES:  Yes, Your Honor.  I would ask for the
 6   Court to recommend Danbury.
 7           THE COURT:  Yup.  That's what I thought.  I think
 8   that's the right call.  I will recommend -- and I'm happy to
 9   recommend the camp if you like.
10           MR. HAYES:  Please, Your Honor.
11           THE COURT:  I'm going to recommend the camp at FCI
12   Danbury.
13           So, Ms. Stephenson, I know you're disappointed, but
14   there's light at the end of this tunnel.  As Mr. Hayes will
15   tell you, you're not going to serve the full six months unless
16   you really do something wrong in prison, and I don't expect
17   that.  And you will be out and you'll be able to move on with
18   your life.
19           I hope things go well for you.  You came here, I
20   think, with good intentions, and it just didn't work out that
21   way for you.  And, unfortunately, you kept going when you knew
22   things were wrong.  But I wish you all the best, ma'am.
23           We'll be in recess.
24           Sixty days for self-surrender?
25           MR. HAYES:  Yes.  Thank you.
```

1          THE COURT:  Let's set a date.  All right, let's say

2    October the 26th for surrender to the facility.

3          So a couple things, Ms. Stephenson.  First of all, I

4    said FCI Danbury.  I'm going to recommend that.  All I can do

5    is make a recommendation.  The Bureau of Prisons, which is not

6    part of the court, will decide where you're incarcerated.

7    Sometimes they follow my recommendations; sometimes they don't.

8    I certainly hope they do in this case.

9          Also, if after 30 days you haven't gotten the

10   designation, you should call Mr. Hayes and urge him to kind of

11   stir the pot, and he'll be able to do that for you, hopefully

12   get the designation, because you don't want to be surrendering

13   to the Marshal Service.  It's better for you to surrender at

14   the facility.

15         We'll be in recess.  Thank you.

16      (Proceedings concluded at 11:21 a.m.)

17

18

19

20

21

22

23

24

25

```
 1
 2
 3                        C E R T I F I C A T E
 4
 5
 6
 7                I, Julie L. Monette, RMR, CRR, CRC, Official
 8    Court Reporter for the United States District Court for the
 9    District of Connecticut, do hereby certify that the foregoing
10    pages are a true and accurate transcription of my shorthand
11    notes taken in the aforementioned matter to the best of my
12    skill and ability.
13
14
15                        /S/ JULIE L. MONETTE
                   _____
16                   Julie L. Monette, RMR, CRR, CRC
                         Official Court Reporter
17                            450 Main Street
                        Hartford, Connecticut 06103
18                            (860) 212-6937
19
20
21
22
23
24
25
```